# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 3, 2013

No. 12-60169

Lyle W. Cayce
Clerk

ASIF MUHAMMAD DHUKA; SEEMA DHUKA, also known as FNU Seema;
ARIB DHUKA

Petitioners

v.

ERIC H. HOLDER, JR., U. S. ATTORNEY GENERAL,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals

Before JONES, BARKSDALE, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This petition for review challenges the Board of Immigration Appeals'
determination that the petitioners could not adjust their status because for more
than 180 days, they had not been in "lawful status."  We conclude the BIA
properly defined "lawful status" and reasonably determined the petitioners had
failed to maintain theirs.  The petition is DENIED.

No. 12-60169

## FACTS AND PROCEDURAL HISTORY

The petitioners are Asif Muhammad Dhuka, his wife Seema Dhuka, and their son, Arib.  They are all citizens of Pakistan.  On November 5, 2000, they were admitted to the United States as nonimmigrant visitors with authorization to remain until May 4, 2001.  Asif Dhuka was approved as a nonimmigrant multinational manager (L-1A visa) on August 3, 2001, and his wife and son as dependents (L-2 visa), due to a petition from Dhuka Enterprises, Inc.  Under these visas, they could remain in the United States until August 2, 2004.

On November 28, 2003, the petitioners applied for adjustment of status based on an I-140 petition filed by an alien relative on Dhuka's behalf.  On September 2, 2005, the Department of Homeland Security ("DHS") denied the I-140 and the adjustment applications, explaining that "many items of conflicting information" made it impossible to determine visa eligibility.  On October 3, 2005, the petitioners filed a motion to reopen and reconsider with DHS, acknowledging that there had been errors in their submissions.  DHS denied the motion two weeks later.

Central to the BIA's later analysis about the length of time that the Dhukas were not in lawful status, their L-1A and L-2 visas expired in August 2004, a year before adjustment of status was denied in September 2005.  As we will explain, the filing of a petition for adjustment of status in 2003 meant that until the petition was acted upon, the expiration of the visas in August 2004 did not prejudice consideration of the petition.  Because the petition was denied, though, the BIA considers that the Dhukas were no longer in lawful status beginning in August 2004 when the visas expired.

No. 12-60169

In March 2006, the petitioners once again applied for adjustment of status, this time based on an I-140 petition filed on Seema Dhuka's behalf, in which she had employment arranged as a nurse. The petition was approved on September 19, 2006, making her eligible for an employment-based visa with a priority date of February 28, 2006. Visa eligibility, though, has "retrogressed," which results when more people applied for a visa for a category of work or from a particular country than there were visas allotted.

On October 3, 2007, DHS sent the petitioners a notice of intent to deny their adjustment applications, explaining that it was unable to process their applications without further information. Specifically, DHS requested evidence showing that the petitioners maintained nonimmigrant status from November 17, 2000 (when they were admitted to the United States as nonimmigrant visitors) through August 3, 2001 (when they changed status to L-1A and L-2 nonimmigrants) and from August 2, 2004 (when their L-1A and L-2 nonimmigrant status expired) through March 10, 2006 (when they filed their second applications for adjustment of status).

On October 31, 2007, the petitioners filed a response to the notice of intent to deny. On December 19, 2007, DHS concluded the petitioners were ineligible for adjustment of status because they had failed to maintain continuous lawful status since their entry into the United States, and were ineligible for an exception to the continuous lawful status requirement because they were out of status longer than 180 days, an exception we explain below. In particular, DHS determined that, when the petitioners filed their second adjustment applications on March 10, 2006, they had been out of status longer than 180 days because

3

No. 12-60169

their L-1A and L-2 nonimmigrant status had expired on August 2, 2004.[1]  The petitioners' motion to reconsider was denied.

On May 28, 2009, DHS served the petitioners with Notices to Appear, charging them with removability under 8 U.S.C. § 1227(a)(1)(B), as aliens who had remained in the United States longer than permitted.  The petitioners appeared with counsel before an immigration judge, conceded their removability, and renewed their applications for adjustment of status based on Seema Dhuka's approved I-140 petition.  The petitioners acknowledged, however, that no visa was immediately available.  Relying on *Masih v. Mukasey*, 536 F.3d 370, 374-75 (5th Cir. 2008), the petitioners argued that, if the immigration judge concluded that they were adjustment eligible, the judge should hold their case in abeyance until a visa became available.  In our analysis, the visa-availability issue is irrelevant because the Dhukas are ineligible for adjustment of status.

Through a series of filings and hearings, the issue was joined about the meaning of "lawful status," which the Dhukas concede they must have sufficiently maintained to be eligible for the relief they seek.  On May 19, 2010, the immigration judge denied the petitioners' applications for adjustment of status. The immigration judge concluded that the petitioners failed to maintain continuous lawful status since their entry into the United States and failed to qualify for any exception to the requirement.

---

[1] As we will discuss later, 8 U.S.C. § 1255(k) provides for an exception to the continuous lawful status requirement in 8 U.S.C. § 1255(c)(2) when the alien applying for an adjustment of status has not been out of status for more than 180 days.  The petitioners argue that they filed their second adjustment applications on March 1, 2006, 179 days after DHS denied their first applications on September 2, 2005, but that DHS improperly rejected the applications on March 3, 2006, requesting evidence that a visa was immediately available, before ultimately accepting their applications on March 10. In light of our ruling, it does not matter whether the March 2006 filing was made less than 180 days after the earlier denial.

No. 12-60169

The petitioners timely appealed the immigration judge's decision to the BIA. On February 3, 2012, in an unpublished three-member panel decision, the BIA dismissed the petitioners' appeal and reinstated the immigration judge's voluntary departure order. The BIA agreed with the immigration judge's determination that the petitioners were ineligible for adjustment of status due to the long period of time in which they were not in lawful status.

A timely petition for review was filed with this court.

DISCUSSION

There are no contested facts in this case, only contested applications of those facts to a few relevant concepts under immigration law. What the Dhukas have sought since 2003 is an adjustment of their status from that of individuals whose right to be in the United States is based on a nonimmigrant work visa and as dependents, to being permanent residents. The pursuit of an adjustment of status began in 2003, when the company at which Asif Dhuka worked filed an I-140 petition seeking an immigrant visa for him so he could continue to work with the company as a manager and executive. Related petitions were filed for his wife and child as dependents.

The BIA held that the Dhukas' lawful status under those visas ended in August 2004, but the expiration of the visas had no repercussions on their effort to adjust their status until the adjustment applications were denied in September 2005. The legal effect of what has occurred beginning with that September 2005 denial is the dispute brought to us.

The primary statute in play is the one governing adjustments in status of a foreign national who lawfully entered as a nonimmigrant (i.e., someone visiting without the intent to remain permanently) to the status of someone

admitted for permanent residency. *See* 8 U.S.C. § 1255. An adjustment of status is not available to someone "who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States . . . ." 8 U.S.C. § 1255(c)(2).

The BIA accepted that the period from the expiration of the work visas in August 2004 until the denial of the petitions for adjustment of status in September 2005 did not create a problem under Section 1255. That point was addressed in *Matter of L-K*, 23 I. & N. Dec. 677, 680 (BIA 2004). There, the BIA held that being out of lawful status could be considered a "technical violation" under Section 1255(c)(2) when a petition for adjustment of status was filed before the lawful status ended and the petition was not ruled upon prior to the expiration of the visa or other authorization; the technical reason was at an "end when the DHS acts other than favorably on" the pending application.[2] *Id.*

The BIA has by regulation given examples of a "technical violation":

> A technical violation resulting from inaction of the Service (as for example, where an applicant establishes that he or she properly filed a timely request to maintain status and the Service has not yet acted on that request). An individual whose refugee or asylum status has expired through passage of time, but whose status has not been revoked, will be considered to have gone out of status for a technical reason.

---

[2] The BIA said its holding was "narrow and limited to the factual scenario at issue in this case." *Matter of L-K*, 23 I. & N. Dec. at 682. The *Matter of L-K* "scenario" was an asylum application. Asylum can be terminated for a variety of reasons, including that a well-founded fear of persecution no longer exists. *See* 8 C.F.R. § 1208.24(a)(3). An adjustment of status is not contingent in that way. There may well be other differences, but *Matter of L-K* is accepted by the parties as a proper explanation of why the time from August 2004 when the Dhukas visa expired, to September 2005 when adjustment of status was denied, was inconsequential to their then-pending applications. For today's purposes, we accept what no party disputes.

No. 12-60169

8 C.F.R. § 1245.1(d)(2)(ii).

The Dhukas insist that the technical reasons should cause the lawfulness of their status to continue until the application for adjustment was denied. The BIA, though, concludes that the technical reasons do not transform the period after visa expiration into "lawful status," but those reasons only prevent the applicants from becoming ineligible for adjustment because they are no longer in lawful status. Once the application was denied, the BIA measured their period of being out of lawful status as starting when the visas expired in August 2004. The wording of Section 1255(c)(2), that an applicant "has *failed* (other than . . . for technical reasons) to maintain continuously a lawful status," addresses the effect of being out of lawful status without redefining a technically violative status as lawful.

The Dhukas disagree. They argue that their stay remained "authorized" after that date, which in their view is equivalent to being in lawful status. They rely on language in 8 U.S.C. § 1182(a), which is entitled "Classes of aliens ineligible for visas or admission." A subsection of that statute sets rules for, as the section and subsection titles state, "Aliens previously removed," and "Aliens unlawfully present." 8 U.S.C. § 1182(a)(9)(B). In that statute is a definition that the Dhukas argue applies to their circumstances.

(ii) Construction of unlawful presence:

For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

7

No. 12-60169

8 U.S.C. § 1182 (a)(9)(B)(ii).  Logically enough, the Dhukas posit that someone has "lawful status" under Section 1255(c)(2) if that person is not yet "unlawfully present" under Section 1182(a), and unlawful presence has not occurred when the alien has been authorized by the Attorney General to stay.  They say they were authorized while their application for adjustment of status was pending and did not lose lawful status until the application was denied.  This question is one of statutory interpretation, and both phrases are in the Immigration and Nationality Act.

An executive branch agency's interpretations of the statutes that it is authorized to administer may be entitled to the deference identified under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  Deciding whether deference is due begins with an examination of whether there is ambiguity in the statute; if there is, the agency's explanation must be a reasonable one.  *Id.*

The BIA's opinion in the present case was issued by a three-member panel, but it was not designated as precedential.  As we will show, some of our sister circuits have declared that certain opinions of the BIA are not to be accorded *Chevron* deference and instead are to be given weight only under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Under this standard, the "weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Id.*  The other circuits have dealt with opinions by a single BIA member, but the courts' analysis has relied on the fact the opinion was not precedential.  That also is the case with many three-member decisions.

8

No. 12-60169

Focusing on the precedential nature of the BIA decision is fairly recent. What apparently was an unpublished BIA opinion was given *Chevron* deference in *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). *See* Brief for Respondent at 23, *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415 (1999) (No. 97-1754), 1999 WL 26721 (stating that BIA decision was unpublished). Subsequently, the Supreme Court sharpened its focus in this area by holding that *Chevron* deference is allowed only when the agency action "carr[ies] the force of law":

> We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.

*United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2001). The *Mead* opinion recognized that "agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them," an agency's reasoned views are entitled to respectful consideration. *Id.* at 227. Thus, a court's analysis of whether *Chevron* deference applies has a predicate requirement that the agency have issued its interpretation in a manner that gives it the force of law.

We examine how the BIA gives such force to its decisions. The procedures applicable to appeals from the rulings of immigration judges permit a single member of the BIA or a three-member panel to decide the appeal. 8 C.F.R. § 1003.1(d) & (e). The regulation does not recognize single-member decisions as having precedential effect and also provides a procedural mechanism by which panel decisions may be given precedential force:

Decisions as precedents. Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board, and decisions of the Attorney General, shall be binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States. By majority vote of the permanent Board members, selected decisions of the Board rendered by a three-member panel or by the Board en banc may be designated to serve as precedents in all proceedings involving the same issue or issues. Selected decisions designated by the Board, decisions of the Attorney General, and decisions of the Secretary of Homeland Security to the extent authorized in paragraph (i) of this section, shall serve as precedents in all proceedings involving the same issue or issues.

8 C.F.R. § 1003.1(g).[3] The opinion on the Dhukas' appeal was not so designated.

We review the analysis of a few of the other circuits. The Tenth Circuit cited Section 1003.1(g) and held that a single-member decision was not entitled to *Chevron* deference because it was not precedential at the BIA. *Carpio v. Holder*, 592 F.3d 1091, 1097 (10th Cir. 2010). Similarly, the Ninth Circuit held that "because the BIA's decision was an unpublished disposition, issued by a single member of the BIA, which does not bind third parties, we conclude that it does not carry the force of law." *Garcia–Quintero v. Gonzales*, 455 F.3d 1006, 1012 (9th Cir. 2006). *Chevron* deference was rejected, and the court then concluded that the decision was unpersuasive under *Skidmore. Id.* at 1013-19. The Eighth Circuit was more tentative, stating its concern that the BIA opinion

---

[3] The regulation at the time of the BIA's *Aguirre-Aguirre* decision in 1996 was similar but without the explanation as to how a decision was made precedential: "Except as they may be modified or overruled by the Board or the Attorney General, decisions of the Board shall be binding on all officers and employees of the Service or Immigration Judges in the administration of the Act, and selected decisions designated by the Board shall serve as precedents in all proceedings involving the same issue or issues." 8 C.F.R. § 3.1(g) (1996).

it was reviewing was unpublished and thus might not have the "force of law," though the less generous *Skidmore* standard might be appropriate. *Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 850-51 (8th Cir. 2008).

The BIA's opinion in this case was by a three-member panel. Though it was not designated to serve as one of the "precedents in all proceedings involving the same issue or issues," it is "binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States." 8 C.F.R. § 1003.1(g). Our issue, then, is whether such a decision has the "force of law" as required by *Mead*. We view the key here as being whether the BIA decision made law that binds third parties. *See Garcia-Quintero*, 455 F.3d at 1012 (explaining that the central issue is "whether the BIA's decision has a 'lawmaking pretense' that binds third parties."). Even a single-member decision is considered to be by the "Board,"[4] and would be included in Section 1003.1(g)'s directive that "decisions of the Board . . . shall be binding on all officers and employees of the Department" and immigration judges. Thus, three-member decisions not designated as precedent have no more force under this regulation than single-member decisions. We conclude that a non-precedential opinion of the BIA does not, due to the terms of the regulation itself, bind third parties and is not entitled to *Chevron* deference. Even so, it will be examined closely for its power to persuade. Controlling prior BIA decisions that the BIA cited will be given *Chevron* deference as appropriate.

---

[4] *See, e.g.,* 8 C.F.R. § 1003.1(e)(4)(ii) ("If the Board member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: 'The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination.'")

No. 12-60169

The relevant statutes are ambiguous on the issue we face. The BIA determined that the phrase "lawful status" under Section 1255(c) should not be synonymous with the phrase "period of stay authorized by the Attorney General," as set forth in Section 1182(a)(9). One reason was that because Congress used one phrase in one section and another phrase in another section, some distinguishable meanings likely would have been intended. The BIA cited two precedents in which the Supreme Court emphasized that we should give the ordinary meaning to the word choices Congress makes in statutes. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *I.N.S. v. Phinpathya*, 464 U.S. 183, 189 (1984). We conclude that "lawful status" implies a right protected by law, while "authorized by the Attorney General" describes an exercise of discretion by a public official. So strictly as a matter of definitions of terms, giving a different meaning to the two phrases is logical. The proper meaning still needs to be determined.

The BIA also stated it was bound by the implementing regulations corresponding to the relevant portions of the controlling statute, which had the force of law. It cited its own precedential, en banc opinion for that proposition: *Matter of Ponce de Leon-Ruiz*, 21 I. & N. Dec. 154, 158 (BIA 1996) (certified by Attorney General under what is now 8 C.F.R. § 1003.1(h)).

The BIA noted that, with one exception not relevant here, the phrase "lawful immigration status," as set out in its regulation that defines eligibility for adjustment of status, did not include any period during which an adjustment application was pending:

> (1) Lawful immigration status. For purposes of section [1255(c)(2)], the term "lawful immigration status" will only describe the immigration status of an individual who is:

(i) In lawful permanent resident status;
(ii) An alien admitted to the United States in nonimmigrant status as defined in section 101(a)(15) of the Act, whose initial period of admission has not expired or whose nonimmigrant status has been extended in accordance with part 214 of this chapter;
(iii) In refugee status under section 207 of the Act, such status not having been revoked;
(iv) In asylee status under section 208 of the Act, such status not having been revoked;
(v) In parole status which has not expired, been revoked or terminated; or
(vi) Eligible for the benefits of Public Law 101–238 (the Immigration Nursing Relief Act of 1989) and files an application for adjustment of status on or before October 17, 1991.

8 C.F.R. § 245.1(d)(1). This list does not imply that there is an additional kind of lawful status, which is to have a pending application for status adjustment.

The BIA went further to say that even if "lawful immigration status" could include some additional classes of aliens, it was limited in this case by the Fifth Circuit's rejection of "a definition of the term so broad as to include all individuals with some form of permission to remain in the United States and authorization to work in this country." *See Bokhari v. Holder*, 622 F.3d 357, 360-61 (5th Cir. 2010); *United States v. Flores*, 404 F.3d 320, 327-28 (5th Cir. 2005). Likewise, the BIA noted that both this court's and its own precedents indicated that the mere pendency of an application to change, extend, or adjust status did not confer "lawful immigration status" on an alien. *See Bokhari*, 622 F.3d at 360-61; *Matter of Teberen*, 15 I. & N. Dec. 689 (BIA 1976).

The analysis so far has largely relied upon precedential decisions of the BIA, the Supreme Court, and this court. We conclude that the BIA's analysis we have discussed so far is a reasonable construction of the two statutory phrases

No. 12-60169

that gives meaning to each. The BIA's precedential decisions on which its current analysis relies are entitled to *Chevron* deference, and the Supreme Court and Fifth Circuit precedents are controlling.

The final part of the analysis is not moored to such precedents, and it requires a more searching review. The BIA found no clear error in the immigration judge's factual determination that, when the petitioners filed their second adjustment applications in 2006, the petitioners had been out of status longer than 180 days because their L-1A and L-2 visas had expired on August 2, 2004. The BIA relied on a 2008 memo issued by David Neufeld,[5] the Acting Associate Director of United States Citizenship and Immigration Services ("USCIS"). The Neufeld Memo discussed an exception to the requirement that an alien filing for adjustment of status have a continuous lawful status. For those seeking certain immigrant visas who entered the country lawfully, it was sufficient that they not be out of lawful status for more than periods that aggregate to 180 days:

> (k) Inapplicability of certain provisions for certain employment-based immigrants
>
> An alien who is eligible to receive an immigrant visa under paragraph (1), (2), or (3) of section 1153(b) of this title (or, in the case of an alien who is an immigrant described in section 1101(a)(27)(C) of this title, under section 1153(b)(4) of this title) may adjust status pursuant to subsection (a) of this section and notwithstanding subsection (c)(2), (c)(7), and (c)(8) of this section, if--
>
> (1) the alien, on the date of filing an application for adjustment of

---

[5] Memorandum from Donald Neufeld, Acting Assoc. Dir., Domestic Operations, HQDOMO 70/23.1-P (July 14, 2008), *reprinted in* 85 Interpreter Releases 2097, 2136 (Aug. 4, 2008).

No. 12-60169

status, is present in the United States pursuant to a lawful
admission;

(2) the alien, subsequent to such lawful admission has not, for an
aggregate period exceeding 180 days--

    (A) failed to maintain, continuously, a lawful status;

    (B) engaged in unauthorized employment; or

    (C) otherwise violated the terms and conditions of the alien's
    admission.

8 U.S.C. §1255(k).

The USCIS, through the Neufeld Memo, explained how to count the 180 days in situations where an alien was in a valid nonimmigrant status when he filed for adjustment (as Asif Dhuka was in November 2003), the nonimmigrant status expired during the pendency of the application, and then the adjustment application was denied. Though the expiration of lawful status would not affect a pending application for adjustment, once the Dhukas' application was denied, the proper date for determining when lawful status ended was the long-past date of August 2004. For the Dhukas' new application, the first day they were out of lawful status was in August 2004 and the last was in March 2006 when the new application was filed. If the Neufeld Memo is a valid interpretation of Section 1255(k), the second application was a year late.

The BIA agreed with the Neufeld Memo, finding it to be "useful, persuasive guidance" for interpreting Section 1255(k). Because neither the BIA opinion as to Dhuka nor the Neufeld Memo is owed *Chevron* deference, we must decide if the BIA analysis persuades.

The BIA acknowledged that Section 245.1(d)(1) of the regulations defines "lawful immigrant status" for purposes of Section 1255(c). Subsection (c)(2) identifies those who are not eligible for adjustment of status, including someone

No. 12-60169

"who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States . . . ." 8 U.S.C. § 1255(c)(2). Section 1255(k) has a related purpose. It states that notwithstanding the requirement of a continuous presence in a lawful status stated in subsection (c)(2), a person lawfully admitted who is eligible to receive certain employment-related visas may adjust status so long as the alien has not for an aggregate of more than 180 days failed to be in a lawful status, along with two other requirements not relevant here. 8 U.S.C. § 1255(k). Certainly "lawful status" in subsection (k) is concerned with the same kind of status – indeed, there is a cross-reference – as the earlier subsection (c).

We agree with the BIA that even though there were no regulations specifically drafted for Section 1255(k), the definition of "lawful immigrant status" applicable to Section 1255(c) is relevant. As we have already noted, the implementing regulation defining "lawful status" for Section 1255(c) does not include a general category of aliens whose lawful status expired during the pendency of an application to adjust their status. Another circuit reached a similar conclusion, holding that the definition of "lawful status" set out in the regulations "forecloses the argument that a 'period of stay authorized by the Attorney General' might also constitute 'lawful status' for purposes of Section 1255." *Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013).

The BIA found that although "lapses in lawful status may be excused where USCIS's delay in adjudicating an application causes the alien to be unable to demonstrate maintenance of status[,] . . . where USCIS denies any such extension, change, or adjustment of status, the alien can no longer be deemed to have 'maintained' lawful status during any period in which only the application

16

for benefits was pending and he did not hold some other status." The BIA relied on *Matter of L-K*, 23 I. & N. Dec. at 680, concluding that "this construction of 'lawful status' form[ed] a parallel to the Neufeld Memo's examples for how to calculate the 180-day period for purposes" of Section 1255(k). It is also relevant that the BIA's analysis of Section 1255(k) is a reasonable one because a different interpretation would extend almost indefinitely the 180-day grace period of being out of lawful status – as indefinite as is allowed by the speed with which a renewed application could be filed after the denial of a previous one. We agree with the BIA that its view is the best one of the meaning of "lawful status."

Lastly, the BIA held there was no reason to hold the case in abeyance due to the fact that Seema Dhuka had her I-140 petition approved and had a current visa priority date at the time she filed for adjustment of status, but her visa priority date had retrogressed since approval. There is caselaw that if a retrogression in visa priority date is all that prevents adjustment of status, the case should be held. *Masih*, 536 F.3d at 373. The foregoing analysis indicates that the problem is not only the retrogression in visa priority. It is that these petitioners were out of lawful status for more than 180 days.

The petition for review is DENIED.