**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 20, 2013

Lyle W. Cayce
Clerk

No. 12-20430

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

ADE LAWRENCE AND FELICIA PARKER,

Defendants–Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before OWEN and HAYNES, Circuit Judges and LEMELLE[*], District Judge.

LEMELLE, District Judge:

Appellants Felicia Parker and Ade Lawrence were convicted in federal district court of conspiracy to possess illicit substances aboard an aircraft with intent to distribute in violation of 21 U.S.C. §963. The conspiracy involved U.S. citizens traveling from the United States to South America to acquire drugs which were then transported to the United Kingdom for distribution. Appellants challenged the application of §959(b) and §963 to their conduct on statutory and constitutional grounds. The district court denied their motions and upheld their

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

No. 12-20430

convictions. For the reasons enumerated below, we affirm the ruling of the district court.

## Procedural History:

On January 11, 2011, a federal grand jury returned an indictment charging Appellants, as well as Sherree Lawrence, Gwendolyn Free, and Monica Mitchell, with conspiring to possess aboard an aircraft with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §963. Lawrence and Parker moved to dismiss the indictment alleging, *inter alia*, that: (1) Congress did not intend for §959(b), the provision of the statute that Appellants are charged with conspiring to violate, to apply extraterritorially; (2) if Congress did enact §959(b)(2) with the intent that it should apply extraterritorially, it went beyond its Constitutional authority in doing so; and (3) the indictment was unconstitutionally vague. The district court denied their motions.

On March 2, 2012, after a five-day trial, a jury convicted Lawrence and Parker of the charged conspiracy. The district court sentenced Lawrence to 235 months of imprisonment, to be followed by five years of supervised release and sentenced Parker to 60 months of imprisonment, to be followed by two years of supervised release. This appeal followed.

## Facts:

In late 2009 through July 2010, Appellants Ade Lawrence ("Lawrence") and Felicia Parker ("Parker"), along with Sherree Lawrence ("Sherree")[1], Gwendolyn Free ("Free"), and Monica Mitchell ("Mitchell"), participated in a plan to transport cocaine from South America to the United Kingdom on board

---

[1] Sherree Lawrence, Appellant Ade Lawrence's wife, will be referred to as "Sherree" in order to avoid confusion with Appellant Lawrence ("Lawrence").

No. 12-20430

commercial airplanes. Parker, Sherree, Free, and Mitchell, all U.S. citizens, served as the couriers. Lawrence, who is originally from Nigeria but entered the United States on a non-immigrant visa, lived in Houston, Texas and after marrying Sherree, applied for (but never obtained) U.S. citizenship. Lawrence took a number of actions while in the United States to further the transportation of the drugs including: hiring drug couriers to work for him, organizing and paying for the couriers' flights, instructing them on where to stay and how to establish communication with local contacts, obtaining a visa for at least one courier, driving at least two couriers to the Houston airport, wiring at least one courier money, wiring at least one courier money while the courier was abroad on a trip to transport drugs, and instructing the couriers on how to dress and act while traveling in order to avoid detection. Each courier applied for an American passport before traveling for Lawrence. Parker filed an application for an expedited passport, listing a travel reservation that had been booked using one of Lawrence's email addresses. The passport applications for Parker, Free, and Sherree listed the same Houston apartment complex where Appellant Lawrence lived in 2009 as an address.

The drug-smuggling trips involved similar patterns. Each courier's smuggling trip originated in Houston. Each courier traveled from Houston to South America aboard a commercial airline. Upon arriving at her destination (usually Sao Paulo, Brazil), the courier would check into a hotel for several days and establish communication with a local contact. During one of Mitchell's trips, she provided her contact with a jacket that Lawrence had given her before she left Houston. The jacket contained an envelope with approximately $15,000 in cash inside one of the jacket's pockets. At some point, the contact would provide the courier with cocaine that had been concealed inside other items, such as

3

shampoo bottles, large candles, or ladies' purses. Appellant Lawrence typically emailed the courier information for her next flight. The courier would then transport the cocaine to London by commercial airplane, stopping in several cities along the way, such as Panama City, Zurich, or Amsterdam. The couriers admitted to knowing they were transporting drugs. If the courier made it to London without getting arrested, the drugs were then transferred to a local contact.

Each leg of the courier's airplane trip was usually booked as a separate round-trip ticket, even though the return ticket was never used. Lawrence typically used the email address estherakinremi@yahoo.co.uk to make travel reservations for the couriers and to email each of them their itineraries.

On at least two occasions, Free was paid £10,000 in cash in London while on a drug smuggling trip - once by a local contact and once by Appellant Lawrence. In both instances, Free brought the money back to the United States, loading most of it onto a prepaid debit card beforehand.  Free took three drug-smuggling trips for Lawrence: in December 2009, she traveled to Ecuador; in March 2010, she traveled to Panama, continuing to the UK; and in April 2010, she traveled to Brazil, continuing to the UK.

On June 5, 2010, Appellant Parker traveled to Sao Paulo, continuing to London (via Panama City, Amsterdam, and Zurich). Parker later told Free that she had delivered the package she picked up in Brazil to the contact in London.

On June 9, 2010, Sherree flew from Houston to La Paz, Bolivia, and later to Sao Paulo, Brazil. Brazilian authorities arrested Sherree at the Sao Paulo airport while she was waiting to board a flight to Amsterdam with her five-year old daughter, after a drug dog alerted authorities to luggage arriving from Bolivia under her daughter's name. Authorities  recovered almost six kilograms

No. 12-20430

of cocaine beneath the false bottoms of two pieces of luggage.

On July 16, 2010, Mitchell flew from Houston to Sao Paulo, where she picked up cocaine hidden inside eight purses. Mitchell then flew to Panama City. On July 25, while Mitchell was waiting to check in for a flight to Switzerland, Panamanian authorities questioned her, searched her luggage, and found almost three kilograms of cocaine hidden inside the purses. Mitchell was arrested and eventually transferred into the custody of the United States.

U.S. federal agents questioned Mitchell in Panama and questioned Free in Texas; both couriers identified Lawrence as the leader of the smuggling operation and Free also implicated Parker as a courier. When interviewed by federal agents, Parker acknowledged knowing Lawrence but said that they saw each other infrequently. Lawrence's cell phone records for the date of Parker's interview showed repeated, as well as attempted, communications with Parker's cell phone.

## Discussion

On appeal, Appellants Lawrence and Parker argue that: (1) the substantive crime underlying the conspiracy charge - possession with intent to distribute in violation of 21 U.S.C. §959(b) - was not intended to apply to possession of illicit substances aboard a plane traveling between two foreign nations with intent to distribute in a foreign country and that extraterritorial application of §959(b) would violate due process and international law; (2) if Congress enacted §959(b)(2) with the intent that it should apply extraterritorially, it went beyond its Constitutional authority in doing so; and (3) the indictment was unconstitutionally vague.

### (1) Extraterritorial Application of 21 U.S.C. §959(b)

The district court judge found that Congress clearly intended for §959 to

No. 12-20430

apply extraterritorially because §959(c) provides for the extraterritorial application of the entire section, including §959(b)(2). This court reviews questions of statutory interpretation *de novo*. *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004).

(A) Statutory Language

21 U.S.C. §959, entitled "Possession, manufacture, or distribution of controlled substance," is located under Subchapter II (Import and Export) of the Drug Abuse Prevention and Control Act ("DAPCA"). §959 states the following:

(a) Manufacture or distribution for purpose of unlawful importation

It shall be unlawful for any person to manufacture or distribute a controlled substance . . .

> (1) intending that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States; or

> (2) knowing that such substance or chemical will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States.

(b) Possession, manufacture, or distribution by person on board aircraft

It shall be unlawful for any United States citizen on board any aircraft, or any person on board any aircraft owned by a United States citizen or registered in the United States, to—

> (1) manufacture or distribute a controlled substance or listed chemical; or
> (2) possess a controlled substance or listed chemical with intent to distribute.

No. 12-20430

(c) Acts committed outside territorial jurisdiction of the United States; venue

This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia.

21 U.S.C. §959.

In determining whether a statute is ambiguous, we employ the traditional tools of statutory interpretation. *Garcias-Carias v. Holder*, 697 F.3d 257, 263 (5th Cir. 2012). While the plain language of the statute is chief among these, the Supreme Court has noted that "[i]n determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *Khalid v. Holder*, 655 F.3d 363, 367 (5th Cir. 2011) (*citing FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000)). A statutory provision "necessarily derives meaning from the context provided by the surrounding provisions, as well as the broader context of the statute as a whole." *Id.*

The phrase "*any* United States citizen on board *any aircraft*" used in subsection (b) of 21 U.S.C. §959 suggests that the entire subsection was meant to apply extraterritorially. 21 U.S.C. §959(b)(emphasis added).  Appellants contend that the provision should be read to refer only to aircrafts traveling within  or to/from the United States. However, given the nature of the international drug trade, possession of an illicit substance aboard an aircraft will often involve travel between foreign nations and consequently, implicates extraterritoriality. *Cf. United States v. Delgado-Garcia*, 374 F.3d 1337, 1347

7

No. 12-20430

(D.C. Cir. 2004) (noting that a statutory provision stating that "[a]ny conveyance, including *any vessel*, vehicle, or *aircraft*, which has been used [in transporting illegal immigrants] shall be seized" had extraterritorial application because conveyances transporting illegal aliens often travel internationally)(emphasis added).[2]

Appellants further contend that as §959(c) states that the "section is intended to reach acts of *manufacture* or *distribution* committed outside the territorial jurisdiction of the United States" and does not explicitly include the word "possession," Congress did not intend that §959(b)(2) should apply extraterritorially.[3] To evaluate this argument, it is helpful to review the manner in which this particular provision was amended. As first enacted, §959 contained only the provisions now codified in subsections §959(a) and (c). Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, §1009, 84 Stat. 1236, 1289 (1970) (prior to 1986 amendment). Congress added §959(b) in 1986. *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, §3161, 100 Stat.

---

[2] In *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) (*citing Morrison v. National Australia Bank, Ltd.*, 130 S. Ct. 2869, 2878 (2010)), the Supreme Court stated that "it is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality" where a statute is otherwise ambiguous on the question of extraterritoriality. The *Kiobel* Court was interpreting the Alien Torts Statute which states that "[t]he district courts shall have original jurisdiction of *any* civil action by an alien for a tort only, committed in violation of the law of nations of a treat of the United States." 28 U.S.C. §1350 (emphasis added). The present case is distinguishable because §959(b) uses the word "any" in conjunction with the word "airplane" and thus presents a different statutory question than that found in *Kiobel*.

[3] Appellant Lawrence also cites to *U.S. v. Lopez-Vanegas*, 493 F.3d 1305, 1313 (11th Cir. 2007) as support for his contention that §959(b) should not apply extraterritorially. However, that Circuit was explicitly referring to 21 U.S.C. §§841 and 846 as not applying extraterritorially. *Lopez-Vanegas*, 493 F.3d at 1313. In the same opinion, the Eleventh Circuit noted that Congress expressly stated its intention for §959 to apply extraterritorially (in contrast to §841). *Id.*

No. 12-20430

3207, 3207-94 - 3207-95 (1986). The original text of the statute was separated into subsections (a) and (c) and the provision at issue, regarding possession, manufacture, or distribution by a person on board an aircraft, was inserted as subsection (b). *Id*. Congress did not amend the new subsection (c) to include the word "possession." Congress also added language to further explain the explicit territorial limitations on §959(a) without adding limiting language to §959(b). *Id*.[4] "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Fla. Dep't of Revenue v. Piccadilly Cafeterias Inc.,* 554 U.S. 33, 42 (2008) (*citing Russello v. United States*, 464 U.S. 16, 23 (1983)). Thus, although the failure to amend subsection (c) could indicate Congressional intent that subsection (b) should not apply extraterritorially, the decision to add limiting language to §959(a) without doing so for §959(b) suggests that §959(b) was not meant to be territorially limited. Furthermore, the second sentence of §959(c) states that "any person who violates *this section* shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia." 21 U.S.C. §959(c) (emphasis added). This sentence refers to the violation of any part of the entire section - including §959(b). Overall, analysis of the statutory amendments weighs in favor of extraterritorial application.

A structural reading of the statute also favors extraterritorial application of §959(b)(2). Appellants argue that as §959(b) falls under the "Import and

---

[4] The words "or into waters within a distance of 12 miles of the coast of the United States" were added to subsection (a).

No. 12-20430

Export" subchapter of the statute, any extraterritorial application should be limited to the possession of illicit substances involving import or export to the United States. Although the Fifth Circuit has stated that it is "appropriate to consider the title of a statute in resolving putative ambiguities," *United States v. Marek*, 238 F.3d 310, 321 (5th Cir. 2001) (*citing Holy Trinity Church v. United States*, 143 U.S. 457, 462 (1892)), this is only relevant where the statutory language is truly ambiguous. "[S]ubchapter heading[s] cannot substitute for the operative text of the statute." *Piccadilly Cafeterias, Inc.*, 554 U.S. at 47. Furthermore, "a statute must, if possible, be construed in such a fashion that every word has some operative effect." *Kay*, 359 F.3d at 742-43 (*citing United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992)); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (citations omitted). To read §959(b)(2) as limited to situations involving import or export to the territorial United States would render it redundant in light of §955 which states that "[i]t shall be unlawful for any person to bring or possess on board any vessel or aircraft . . . arriving in or departing from the United States . . . a controlled substance." 21 U.S.C. §955. Thus, because §955 of DAPCA explicitly targets acts of import and export to the United States, §959(b)(2) should not be read as similarly limited.

Ultimately, an analysis of both the statutory language and structure of the statute supports extraterritorial application of the statute.

(B) Presumptions Regarding Extraterritoriality

"'It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the

territorial jurisdiction of the United States.'" *United States v. Villanueva*, 408 F.3d 193, 197 (5th Cir. 2005) (*citing Smith v. United States*, 507 U.S. 197, 204 (1993) (internal citations omitted)). However, this presumption can be overcome where extraterritorial application can be "inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved." *Id.* at 199 (*citing United States v. Baker*, 609 F.2d 134, 136 (5th Cir. 1980)). In *United States v. Bowman*, the Supreme Court articulated when the presumption against extraterritoriality may be overcome in the context of criminal statutes. 260 U.S. 94, 98 (1922). The presumption that Congress intends to limit the jurisdiction of its statutes to the territorial United States "should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, *especially if committed by its own citizens*, officers, or agents." *Id.* (emphasis added). Furthermore, intent to extend jurisdiction beyond the territorial United States can also be inferred where "to limit [the] locus [of the offense] to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute." *Id.*

Extraterritorial application of §959(b) is justified under *Bowman*. "In the context of drug smuggling laws, this Court has found the necessary congressional intent to overcome the presumption against extraterritorial application," *Villanueva*, 408 F.3d at 199, and in evaluating DAPCA's statutory framework, this Court has previously commented that Congress intended that the statute "have a broad sweep in dealing with all aspects of drug abuse." *Baker*, 609 F.2d at 137. However, previous cases on extraterritorial application

No. 12-20430

of drug statutes involved Defendants intending to export illicit drugs from the United States or to import and distribute them within the United States. *See id.* Yet, other Circuits have asserted that the United States government may make efforts to stem the international drug trade "without any showing of an actual effect on the United States" because of the threat that the international drug trade presents to the nation's ability to function. *United States v. Perlaza*, 439 F.3d 1149, 1162 (9th Cir. 2006). In enacting the DAPCA, Congress noted the United States' status as a party to "international conventions designed to establish effective control over *international* and domestic traffic in controlled substances." 21 U.S.C.A. § 801 (2012) (emphasis added). Explicit reference to this status supports Congressional intent for extraterritorial application of DAPCA. Thus, limiting the application of §959(b) to domestic possession of illicit drugs on an aircraft would greatly curtail the intended scope and usefulness of DAPCA.

### (C) International Law Principles

Having established Congressional intent to give §959(b) extraterritorial application, we must now consider whether international law permits the exercise of such jurisdiction. *Rivard v. United States*, 375 F.2d 882, 885 (5th Cir. 1967); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir. 1984). "Under international law a state does not have jurisdiction to enforce a rule of law prescribed by it, unless it had jurisdiction to prescribe the rule." *Rivard*, 375 F.2d at 885 (*citing* Restatement, SECOND OF FOREIGN RELATIONS LAW § 7(2) (1965)). "The law of nations permits the exercise of criminal jurisdiction by a nation under five general principles. They are the territorial, national, protective, universality, and passive personality principles." *Id*. Under the nationality principle, "a country  may supervise and regulate the acts of its

citizens both within and without its territory." *United States v. Columba-Colella*, 604 F.2d 356, 358 (5th Cir. 1979). It is generally accepted that "the legislative authority of the United States over its citizens extends to conduct by Americans . . . even within the territory of other sovereigns." *United States v. Mitchell*, 553 F.2d 996, 1001 (5th Cir. 1977) (*citing Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952)). Under this theory, the exercise of jurisdiction over Appellant Parker's extraterritorial conduct is proper as she is a United States citizen.

"Under the protective theory . . . a country's legislature is competent to enact . . . [and] enforce criminal laws *wherever and by whomever* the act is performed that threatens the country's security or directly interferes with its governmental operations." *Columba-Colella*, 604 F.2d at 358 (emphasis added). As noted earlier, Congress has demonstrated, in enacting DAPCA and in ratifying various international conventions on the eradication of drug trafficking, that it considers the international drug trade to be a major threat to the safety of the United States. *See, e.g.,* 21 U.S.C. §801; United Nations Single Convention on Narcotic Drugs, 1961, Mar. 30, 1961, 18 U.S.T. 1407, 520 U.N.T.S. 151 ("Single Convention"); United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, 1988, Dec. 19, 1988, 28 I.L.M. 493, 1582 U.N.T.S. 95. Furthermore, other courts have relied on the protective principle to justify jurisdiction over extraterritorial crimes involving drug smuggling. *See, e.g., Perlaza*, 439 F.3d at 1162 (drug trafficking "presents the sort of threat to our nation's ability to function that merits application of the protective principle of jurisdiction"); *United States v. Newball*, 524 F.Supp. 715, 720 (E.D.N.Y. 1981); *United States v. Egan*, 501 F.Supp. 1252, 1258 (S.D.N.Y. 1980). Appellant Lawrence recruited drug couriers within the United States and

organized a plan to traffic drugs internationally. Given Congressional efforts to halt the international drug trade, we find that criminalization of Appellant Lawrence's conduct is justified under the protective principle. The court notes that we do not, today, address the question of application of §959(b) to a crime where absolutely no actions related to the crime were committed in the United States or to a situation where the conduct at issue was lawful in the jurisdictions in which it occurred but unlawful in the United States.

### (D) Extraterritorial Application of §963

Appellants argue that as §963 does not contain explicit language regarding extraterritorial application, the presumption against extraterritorial application should apply. However, this Circuit has previously applied §963 extraterritorially. *See, e.g., United States v. Postal*, 589 F.2d 862, 885-86 (5th Cir. 1979). Furthermore, courts have "inferred the extraterritorial reach of conspiracy statutes on the basis of a finding that the underlying substantive statutes reach extraterritorial offenses." *Chua Han Mow*, 730 F.2d at 1311. Thus, §963 can be applied extraterritorially.

### (E) Due Process Challenge

In *Blackmer v. United States*, the Supreme Court stated that U.S. citizens "owe allegiance to the United States [and that] [b]y virtue of the obligations of citizenship, the United States retain[s] its authority over [its citizens], and [its citizens are] bound by its laws made applicable to [them] in a foreign country." 284 U.S. 421, 437 (1932). In that case, the Court found that a U.S. citizen was still subject to punishment in the courts of the United States for violations of United States' laws through conduct perpetrated abroad. *Id.* Under *Blackmer*, application of §959(b) to Appellant Parker, a U.S. citizen, does not violate the

No. 12-20430

Due Process Clause.

In the context of non-U.S. citizens, "due process requires the Government to demonstrate that there exists 'a sufficient nexus between the conduct condemned and the United States' such that application of the statute would not be arbitrary or fundamentally unfair to the defendant." *Perlaza*, 439 F.3d at 1160 (citations omitted). Appellant Lawrence himself and his part in the conspiracy do have such a nexus to the United States: Lawrence resided in Houston, Texas with his wife (who served as one of his couriers), recruited drug couriers, formulated the plan to traffic drugs, bought plane tickets, applied for his drug couriers' passports, and transferred some of the requisite cash to his couriers all in the United States.  These contacts create a nexus sufficient to satisfy due process requirements.

## **(2) Congressional Authority to Enact 21 U.S.C. §959(b) with Extraterritorial Application**

This court reviews constitutional challenges *de novo. United States v. Romero-Cruz*, 201 F.3d 374, 377 (5th Cir. 2000).

### (A) Congressional Authority Under the Necessary and Proper Clause

The United States Constitution expressly empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution [Congress's Article 1, §8] Powers and all other Powers vested by this Constitution in the Government of the United States." *Jinks v. Richland County, South Carolina*, 538 U.S. 456, 461 (2003); *see* U.S. CONST. art. I, §8, cl. 18.  The Supreme Court has "rejected the view that the Necessary and Proper Clause demands that an Act of Congress be '*absolutely necessary*' to the exercise of an

enumerated power. . . [I]t suffices that [a statute] is 'conducive to the administration of justice' in federal court, and is 'plainly adapted' to that end." *Id.* at 462 (*citing McCulloch v. Maryland*, 17 U.S. 316, 414, 417, 421 (1819)). "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 130 S.Ct. 1949, 1956 (2010) (*citing Sabri v. United States*, 541 U.S. 600, 605 (2004)). Congress possesses authority to criminalize conduct in the course of "carrying into Execution" the powers "vested by" the United States Constitution. *Id.* at 1957-58.

### (i) Congressional Authority to Enforce International Treaties

"[The President] shall have power, by and with the Advice and Consent of the Senate, to make Treaties." U.S. CONST. art. II, § 2, cl. 2.  All treaties ratified by Congress become the supreme law of the land. U.S. CONST. art. VI, cl. 2. At the time that DAPCA was enacted, the United States was party to the Single Convention on Narcotic Drugs (1961), to which Congress made explicit reference when it passed DAPCA, *see* 21 U.S.C. § 801(7), highlighting the Convention's relevance to the enactment of the legislation.

Article 36 of the Single Convention states that each Party to the Convention shall adopt such measures as will ensure that, *inter alia*, possession of drugs "contrary to the provisions of this Convention, and any other action which in the opinion of such Party may be contrary to the provisions of this Convention, shall be punishable offenses when committed intentionally." United

No. 12-20430

Nations Single Convention on Narcotic Drugs, 1961, art. 36(1), Mar.30, 1961, 18 U.S.T. 1407, 520 U.N.T.S. 151. Appellants note that Art.36(2)(a)(iv) of the Single Convention states that offenses "committed either by nationals or by foreigners shall be prosecuted by the Party in whose territory the offence was committed" and argue that allowing §959(b)(2) to have extraterritorial effect would violate the treaty. Appellants' reliance on this provision is unavailing. First, as previously noted, under the protective principle, it is accepted that a state may enforce its laws against its own citizens abroad without offending the sovereignty of foreign nations. *Columba-Colella*, 604 F.2d at 358. Thus, the prosecution of Appellant Parker, a U.S. citizen, comports with international law. Furthermore, the Single Convention states that "[i]ntentional participation in, *conspiracy to commit* and attempts to commit, any of such offences, and preparatory acts and financial operations" in connection with prohibited offenses will be punishable. *Id.* at art. 36(2)(a)(ii) (emphasis added). Both appellants were charged with *conspiracy* to possess with intent to distribute. As previously noted, Appellant Lawrence formed the conspiracy in the United States and took a multitude of actions in furtherance of the conspiracy in the United States. Thus, application of §§ 959(b)(2) and 963 to Appellant Lawrence is also consistent with U.S. treaty obligations.

Given the directives of the Single Convention, extraterritorial application of §959(b)(2) is rationally related to the implementation Congress's treaty-making power, "conducive to the administration of justice" in federal court, and "plainly adapted" to that end. Thus, we find that extraterritorial application of §959(b)(2) in this case is permissible as implementing Congress' treaty-making power under the Necessary and Proper Clause.

No. 12-20430

## (3) Constitutional Sufficiency of the indictment

This Court reviews the sufficiency of an indictment *de novo*. *United States v. Morrow*, 177 F.3d 272, 296 (5th Cir. 1999). The purpose of an indictment is "to allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *Id. (citing United States v. Cluck*, 143 F.3d 174, 178 (5th Cir. 1998), *cert. denied*, 525 U.S. 1073 (1999). Thus, an indictment is sufficient if it "contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend." *United States v. Fuller*, 974 F.2d 1474, 1480 (5th Cir. 1992) (*quoting United States v. Graves*, 669 F.2d 964, 968 (5th Cir. 1982)).

It is well established that in "an indictment for conspiring to commit an offense-in which the conspiracy is the gist of the crime- it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *Graves*, 669 F.2d at 968 (*citing Wong Tai v. United States*, 273 U.S. 77, 81 (1927)). Although some conspiracy statutes require an indictment to list the overt acts taken in furtherance of the conspiracy, *see, e.g.*, *United States v. Ivey*, 949 F.2d 759, 765 (5th Cir. 1991); *United States v. Evans*, 572 F.2d 455, 483 (5th Cir. 1978), §963 does not have such a requirement. In *United States v. Shabani*, 513 U.S. 10, 13 (1994), the Supreme Court held that the language of 21 U.S.C. §846, which is identical to the language found in §963, does not "require[] that an overt act be committed to further the conspiracy" and it has "not inferred such a requirement from congressional silence in other conspiracy statutes." Additionally, the Fifth

18

No. 12-20430

Circuit stated in *United States v. Thomas*, 567 F.2d 638, 641 (5th Cir. 1978), that while "several Fifth Circuit cases have proceeded under the assumption that [§ 963] requires that overt acts be alleged," the section does not, in fact, have such a requirement.

In the instant case, the indictment charged Appellants Lawrence and Parker with knowingly and intentionally combining, conspiring, and agreeing with each other and with other co-conspirators to knowingly and intentionally possess illicit substances, aboard an aircraft, with intent to distribute in violation of 21 U.S.C. §959(b). The indictment includes approximate dates and charges that the conspiracy involved an agreement to book flight itineraries with multiple legs from the United States to Brazil and then Great Britain. The indictment further charges that defendants booked itineraries, traveled on these itineraries to Brazil, where they picked up luggage containing cocaine and that they would then transport the cocaine from Brazil to Great Britain on commercial aircrafts, transiting through various other countries. Once in Great Britain, the defendants would deliver the cocaine to a co-conspirator before traveling back to the United States. This recital of facts and the elements of conspiracy to commit the relevant offense was sufficient to enable appellants to prepare their defenses.

## **Conclusion:**

For the foregoing reasons, we affirm the district court judgment.

*     *     *